W. SHARP, Judge.
Phyllis T. Garvin appeals from the trial court’s order which denied her request for an injunction to halt the conduct of a recall election scheduled to be held shortly after the order was rendered. At issue in the recall election is her right to continue to hold the offices of Vice Mayor and City Council Member of the City of Daytona Beach Shores, Florida. The trial court ruled that the recall election should proceed as scheduled on November 3, 1998, but that the results of the election should be sealed and not released for a sufficient time to allow Garvin to seek a stay from the appellate court. This court extended the stay which sealed the election results, pending our determination of the cause, and expedited the conduct of this appeal. We affirm, and lift the stay.
Garvin first argues on appeal that the petition for recall was legally insufficient. It contained five separate grounds for Garvin’s removal:
1. Malfeasance due to persistent repeated violations of City Manager form of government and section 3.06 of the Charter by:
a. Giving direct work instructions to city employees William Lazarus, Cathy Benson and Joe Blankenship, without first going through city manager.
*1226 b. Without Council discussion or approval, taking unlawful unilateral action to advertise for a part-time interim City-Manager.
2. Malfeasance, as without lawful grounds she makes every effort to deprive applicants of their rights of due process of law.
3. Violation of her oath of office (Sec. 2.08) by subverting the City Manager form of government.
4. Misfeasance, in that she continually intimidates and harasses city employees to effectuate her personal desires.
5. Malfeasance of office in that she urged council member Marion Kyser not to attend a council meeting so that a quo-ram would not be available.
The trial court ruled that grounds 2, 3 and 4 were legally insufficient, but that grounds 1 and 5 were sufficient to premise a recall election pursuant to section 100.361, Florida Statutes (1997). All of the parties agree that this statute controls this cause and that Day-tona Beach Shores is a municipality governed by these statutory provisions concerning recall elections. The statute provides that the following conduct justifies the holding of a recall election:
The grounds for removal of elected municipal officials shall, for the purposes of this act, be limited to the following and must be contained in the petition:
1. Malfeasance;
2. Misfeasance;
3. Neglect of duty;
4. Drunkenness;
5. Incompetence;
6. Permanent inability to perform official duties;' and
7. Conviction of a felony involving moral turpitude.
§ 100.361(1)(b), Fla. Stat. (1997).
We agree with the trial court that grounds 2, 3, and 4 were too vague to constitute valid bases for recall under the statute. See Bent v. Ballantyne, 368 So.2d 351 (Fla. 1979); Taines v. Galvin, 279 So.2d 9 (Fla. 1973); Moultrie v. Davis, 498 So.2d 993 (Fla. 4th DCA 1986). Grounds to remove an official from office must have reference to some specific misdeed relating to official duties. We are also not confident that ground 5 is legally sufficient. Urging a fellow council member not to attend a meeting to deprive it of a quorum, does not expressly violate the City Charter, nor is the avoidance of a quorum an uncommon political strategy.
However, we agree with the trial court that ground 1 is legally sufficient. Section 3.06 of the City Charter provides:
Except for purposes of investigation, inquiry and information, the council and committees or individual members thereof, shall deal with the city officers and employees of the city solely through the manager, and neither the council nor its members shall give orders to such officer or employee, either publicly or privately. Any such action shall constitute malfeasance within the meaning of Article IV, Section 7(a) of the Florida Constitution. This prohibition shall in no way restrict the right of individual council members, to observe personally and scrutinize closely all aspects of city government in order to obtain independent information for use by the council in discharging its responsibility to formulate sound policies to hold the administration accountable to the people, and to increase the efficiency and economy of city government wherever possible, (emphasis supplied)
The allegations of the recall petition state that Garvin “gave direct work instructions to city employees without going through the city manager.” Garvin argues that Ground 1 is insufficient because the giving of instructions to city employees, not orders, is not proscribed by the Charter.' She urges that instructions “are in the nature of advice or directions conveying information, as opposed to orders or mandates.” We conclude that this is too fine a semantical distinction. A recognized dictionary definition for “instructions” is “statements making known to a person what he (or she) is required to do, an order. ” (emphasis supplied). Oxford American Dictionary 343 (1980). Also, section 3.06 requires that Garvin deal with city employees only through the city manager. Thus, even if instructions are not orders, she *1227 was still prohibited from dealing directly with city employees under the Charter.
In Wolfson v. Work, 326 So.2d 90 (Fla. 2d DCA 1976), a similar malfeasance ground was charged in a recall petition against a city official. There it was claimed that a city commissioner violated the city charter by giving orders to city employees, who were subordinates of the city manager. The trial court, affirmed by the appellate court, ruled that this express violation of the city charger was an adequate legal basis on which to premise a recall election.
We now come to the more difficult question: Assuming four grounds set forth in the recall petition were insufficient and one was legally sufficient, does that invalidate the recall process?[1] There are two cases from our sister courts which address this question, and reach opposing views. Wolfson was an appeal from the denial of the office holder’s request to enjoin the recall process to remove him from his office of city commissioner. Both the trial court and the appellate court found that one ground, the same one, incidentally as is involved in this case, was legally sufficient.
However, in Wolfson there were four other grounds set forth in the recall petition. The trial court refused to strike them and the appellate court ruled no error occurred. It reasoned that there is no legal requirement that all grounds in a recall petition be legally sufficient. “Only the complete failure of all the charges to meet the statutory requirements will justify enjoining an election. One charge meeting the statutory mandate is sufficient.” (emphasis in original) Wolfson, 326 So.2d at 91. See E. McQuillin, 4 Municipal CORPORATIONS § 12.251.16 (3d ed.1992). The court further observed that in an election setting, the other charges more than likely would surface during a campaign anyway and such campaign charges would not void the election.
Davis v. Friend, 507 So.2d 796 (Fla. 4th DCA 1987) held, in contrast, that where a recall proceeding was predicated on four substantive charges set forth in a recall petition and three of the four had been stricken as legally insufficient, the petition with its one remaining charge could not serve as the basis for a recall election. The court reasoned that it would be impossible to determine whether the voters who signed the petitions and voted in an election, relied on the invalid reasons rather than the valid one. It said: “We disagree with Wolfson to the extent it holds that recall proceedings may not be enjoined even though they are predicated on a petition substantially based on invalid grounds.” Davis, 507 So.2d at 797.
One could attempt to distinguish Davis from Wolfson on the ground that there was some kind of showing in Davis that a substantial number of voters endorsed the petition on the basis of all four charges and that the three charges stricken “superficially appeared] to be more serious” than the remaining legally sufficient charge. Id. However, in the next breath the court recognized that “it is impossible to determine whether those voters would have endorsed the recall petition in the absence of three (3) [invalid] charges.” Id. Nor do we think appellate courts have sufficient guidance in the law to determine whether stricken charges are “more serious” than a remaining sufficient charge. If legally insufficient, it is difficult to conclude the charges are “more serious.”
We chose to align ourselves with Wolfson. Wolfson distances the courts and judges further from the legislative and political elective process than Davis. We are comfortable with that result, although we realize it puts elected officials at greater risk of removal from office. In fairness to the office holder who is being subjected to a recall process, if the legal sufficiency of recall grounds set forth in a recall petition are challenged promptly, they should be ruled upon by a court early enough in the process so that any invalid grounds would be stricken. However, the failure to do so does not, in our view, invalidate the recall process and election.
Garvin’s second, major argument on appeal is that the Supervisor of Elections did *1228 not properly certify the 15 percent petition for recall. In section 100.361, which governs the recall process, the Legislature has provided a mechanism for its execution which is specific in many regards but not so clear and specific in others. The process is commenced with the preparation of a petition for recall directed against the office holder sought to be recalled, containing a statement of the grounds for recall in not more than 200 words.[2] In a municipality the size of Daytona Beach Shores, this petition must be signed by at least 250 electors or 10 percent of the total number of registered electors of the municipality, whichever is greater.[3] The petition is eventually filed with the city clerk within 30 days of the first signature on the petition, who then delivers it to the supervisor of elections.[4] Within 30 days after that, the supervisor of elections must certify that the petition contains the required number of valid signatures. This aspect of the recall process is not being challenged in this case.
If the petition has the required signatures, the city clerk serves a copy of the petition on the person sought to be recalled. That person files a defense of not more than 200 words, and the clerk prepares counterparts of the recall petition with the statement of grounds and the defenses and space sufficient for signature by 30 percent of the electors.[5] The recall committee then circulates the petition in the community to obtain the signatures of at least 15 percent of the electors. This must be accomplished within 60 days after the clerk delivers the petition to the committee for recall.[6]
The petitions are filed with the city clerk, who again delivers them to the supervisor of elections. The supervisor must ascertain there are sufficient verified signatures and so certify within 30 days.[6] If there are, the chief judge of the circuit in which the municipality lies must fix a day for the holding of the recall election, not less than 30 days or more than 60 days after the office holder has received a notice that she or he has the option to resign or face a recall election.[7] The ballots ask the question whether the named person shall be removed from office, and a space to mark “X” is set in front of: _. should be removed;” “_ should not be removed.” A majority vote of the qualified electors voting in that election is controlling.
Garvin points out that the statute provides, with regard to the initial 10 percent petition, that the pool of qualified voters is precisely described as “10 percent of the total number of registered electors of the municipality or district as of the preceding municipal election.” [8] Thereafter, the statute is silent as to the voter pool to which the other percentages must be applied. With regard to the 15 percent petition, the statute merely says “15 percent of the qualified electors of the municipality;” [9] and the clerk is directed to provide room for signatures on the petition sufficient for “30 percent of the registered electors.”[10]
Garvin argues that the 15 percent petition certification refers to the then current number of qualified electors in the municipality, at the time the supervisor of elections is required to certify sufficient signatures to trigger the recall election. This could possibly be a larger number than 15 percent of the qualified electors at the last municipal election.
Garvin points out this difference of voter pools could be critical in this case. The Supervisor of Elections verified 753 signatures on the 15 percent petition. But the trial court excluded 58 of them as invalid, and found there were 695 remaining valid signatures. The trial court concluded that the 695 figure was “still more than 15 percent of the three thousand seventy-eight (3,078) regis *1229 tered voters in Daytona Beach Shores as of the last municipal election on September 30, 1997.” (emphasis added)
Assuming there exist the maximum of 5,000 registered voters in Daytona Beach Shores (the most in the category in which this city is classified pursuant to section 100.361(l)(a)l.), 15 percent required to trigger the recall election would have been 750 electors. The 695 electors found valid signatories to the petition would not have been enough. Assuming that is the pool to which the statute has a reference, Garvin made no effort to establish what the correct number of qualified voters was, on the date the Supervisor of Elections certified the 15 percent petition.
Undoubtedly the Legislature could have been more consistent and precise in the drafting of this aspect of the statute. In the first place, mentioned in the statute, the Legislature does spell out that the pool to which the 10 percent petition refers is the number of qualified voters, “as of the last municipal election.” Thereafter, the pool is not again specifically described: with regard to either the 15 percent petition, or the requirement for a space for 30 percent of the qualified voters to sign on the 15 percent petitions. If we were to say a different voter pool is meant than the one described for the 10 percent petition, we would have to add language to the statute, and we are not certain we would get it right. Those voter pool references could apply to various times: it could be the qualified voters as of the date the 10 percent petition is certified, or the qualified voters as of the date the 15 percent petition is certified.
Absent specific statutory language to the contrary, we think the most logical reading is to say the voter pools referenced throughout the statute are the same — the one described in section 100.361(l)(a). In the beginning of the statute, the Legislature specifically describes the pool as the qualified electors, “as of the date of the last municipal election.” Thereafter, the other two general mentions of the voter pool, by inference, refer back to the initial voter pool description. All of these provisions appear close together in one section of the recall process statute. Had the Legislature intended reference to a different voter pool for the last two voter pool requirements of the statute, it appears more likely to us that it would have specifically described them. Not to have done so leads us to believe the same voter pool was intended to be used throughout the recall process. See McQuillin, 4 Municipal Corporations § 12.251.20 (3rd ed.' 1992) (“The recall petition is required to be signed by qualified or registered voters of a certain percentage of the entire vote cast at a named election, usually at the last preceding general municipal election, for an officer named, as the mayor.”).
Finally, Garvin argues that the trial court erred in denying her emergency motion to stay the election and the tallying of the election results, because she was entitled to an automatic stay on appeal, pursuant to Florida Rule of Appellate Procedure 9.310(b)(2). That rule provides
The timely filing of a notice shall automatically operate as a stay pending review, except in criminal cases, when the state, any public officer in an official capacity, board, commission, or other public body seeks review....
In this case, Garvin filed her appeal before the municipal election had been held. Thus, she argues her appeal should have halted the recall process until the lower court’s refusal to enter an injunction was reviewed by this court. It does not appear to us that the automatic stay exception of Florida Rule of Appellate Procedure 9.310(b)(2) is intended to apply to prevent the recall election from proceeding.
AFFIRMED.
GRIFFIN, C.J., and THOMPSON, J., concur.

. If all of the allegations in a recall petition are legally insufficient, the election should clearly be enjoined. See Bent v. Ballantyne, 368 So.2d 351 (Fla.1979); Taines v. Galvin, 279 So.2d 9 (Fla. 1973).

. § 100.361(1)(a), Fla. Stat.

. § 100.361(1)(a)(3), Fla. Stat.

. § 100.361(1)(d), Fla. Stat.

. § 100.361(1)©, (g), (h), Fla. Stat.

. § 100.361(1)(h), Fla. Stat.

. § 100.361(1)(h), Fla. Stat.

. § 100.361(2), Fla. Stat.

. § 100.361(l)(a), Fla. Stat.

. § 100.361(1)©, (g), (h), Fla. Stat.

. § 100.361(1)©, Fla. Stat.